**TERRITORY OF ALASKA, Plaintiff,**
v.
**THE ARCTIC MAID and Arctic Maid Fisheries, Inc., Defendants.**

**TERRITORY OF ALASKA, Plaintiff,**
v.
**THE PACIFIC QUEEN and Pacific Queen Fisheries, Defendants.**

**TERRITORY OF ALASKA, Plaintiff,**
v.
**ALASKA REEFER FISHERIES, Defendant.**

**TERRITORY OF ALASKA, Plaintiff,**
v.
**THE NORTH STAR and North Star Fisheries, Defendants.**

**TERRITORY OF ALASKA, Plaintiff,**
v.
**AMERICAN PACKING CO., Pacific Reefer Fisheries, a partnership, and THE PACIFIC REEFER (a vessel), Defendants.**

**TERRITORY OF ALASKA, Plaintiff,**
v.
**NORTHERN REEFER COMPANY, Grimes Packing Company, and THE REEFER II (a vessel), Defendants.**

**TERRITORY OF ALASKA, Plaintiff,**
v.
**PACIFIC REEFER FISHERIES, Defendant.**

Nos. A–7093, A–7130 to A–7132, A–7142, A–7143, A–7129.

District Court, Alaska
First Division, Juneau.
March 17, 1956.

See also 135 F.Supp. 164.

pational license taxes totaling, with penalty and accrued interest, $116,730.21, imposed by the Territory for the years 1951 to 1954 incl. under the provisions of Chapter 97, S.L.A.1949, as amended by Chapter 116, S.L.A.1951.

The pertinent parts of the statute involved read as follows:

"Section 1. Businesses in Alaska Fisheries Requiring Licenses: Amounts Thereof. Any person, firm or corporation prosecuting or attempting to prosecute any of the following lines of business in connection with Alaska's commercial fisheries shall first apply for and obtain, on the conditions hereinafter set forth, a license so to do on the basis of the following license taxes which are hereby levied:

"(a) Shore based cold storages and all other fish processors, except salmon canneries, herring processing plants, crab canneries and clam canneries otherwise licensed: An annual license tax equal to 1% of the value of the raw halibut, halibut livers and viscera, salmon and bottom fish, shellfish or other fishing resource bought or otherwise obtained for processing through freezing * * *.

"(b) Freezer ships and other floating cold storages: An annual license tax equal to 4% of the value of the raw halibut, halibut livers and viscera, salmon and bottom fish, shellfish or other fishing resource bought or otherwise obtained for processing through freezing. * * *"

Defendants deny liability for the tax, setting up six defenses, in substance as follows:

(1) A general denial of liability, under which issue defendants raise a question of statutory construction, denying that the fish which they buy or otherwise obtain are bought or obtained "for processing through freezing," but that they are obtained "for the purpose of preserving the fish for later processing through canning."

J. Gerald Williams, Atty. Gen., Territory of Alaska, and Edward A. Merdes, Asst. Atty. Gen., Territory of Alaska, for plaintiff.

Evans, McLaren, Lane, Powell & Beeks, Seattle, Wash., and John H. Dimond, Juneau, Alaska, for defendants.

HODGE, District Judge.

Plaintiff in seven consolidated actions seeks to recover of the defendants occu-

(2) That the fish taken by them are so taken partly in and partly outside of the three-mile limit and frozen aboard the vessel to preserve them for transportation to the State of Washington for canning, and that therefore their activities are beyond the taxing jurisdiction of the Territory, as in violation of Sections 3 & 9 of the Organic Act, 48 U. S.C.A. §§ 24 & 77, and the due process clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States.

(3) That the provisions of Chapter 97 abridge, impair, and deny to the defendants the right to take or preserve fish in the waters of the Territory, in violation of the White Act, 48 U.S.C.A. § 222, as amended, and Section 3 of the Organic Act.

(4) The tax imposed is invalid and unconstitutional in that it imposes an undue burden on interstate commerce, and discriminates against and is an attempted regulation of interstate commerce, in violation of Article I, § 8 of the Constitution.

(5) The tax unreasonably and arbitrarily discriminates against freezer ships and floating cold storages in favor of shore-based cold storages, which classification and discrimination is without reasonable justification, in violation of the equal protection, due process, and privileges and immunities clauses of the Fifth Amendment, the privileges and immunities clause of Article IV, § 2, of the Constitution of the United States, and of Section 9 of the Organic Act.

(6) The tax imposed is arbitrary, oppressive, and confiscatory, and constitutes an attempted taking of defendants' valuable property and denial of their right to fish and preserve fish, in violation of the due process clauses of the Fifth and Fourteenth Amendments to the Constitution.

The following facts are undisputed: Defendants are the owners and operators of certain "freezer ships," converted and equipped with refrigeration facilities for the freezing of fish in the Territorial waters of Alaska, which are frozen by the "brine method," dumped into refrigerated holds, and taken to Puget Sound, Washington, where they are canned prior to resale. The freezer ships themselves do not engage in any fishing, but the fish loaded aboard the vessels are obtained either by purchase from individual fishermen or by the operation of "catcher boats" owned and operated by the defendants, or under contractual arrangement between the defendants and the owners of such boats. Fishing is done by means of gill nets in the Bristol Bay area and seines in other areas. Vessels anchor seaward of the three-mile zone while operating in the Bristol Bay area during such season, but while operating in the Kodiak Island and Southeastern Alaska areas they anchor at points closer to the shore than three miles, usually in bays or inlets. The fishing boats operate between the ships and the shore, in all cases inside of the three-mile zone. Taxes have been paid by the defendants under the Act for the period from 1951 to 1954 inclusive amounting to $8,929.99, but taxes accrued amounting to $93,583.75, exclusive of penalty and interest, have not been paid; and it is conceded that such taxes are due and owing to the Territory if valid.

The defenses interposed will be considered in the order named.

(1) The contention that the fish are not obtained for "processing through freezing" as defined by the Act cannot be sustained within any reasonable statutory interpretation. The word "process" or "processing" in the sense used in this statute is defined by Webster's New International Dictionary as "a method of operation or treatment," and "denotes a progressive action or series of acts or steps, especially in the regular course of performing, producing or making something." It "applies especially to measures or transactions, as a chemical process." It cannot be denied that freezing is "processing" as thus commonly understood.

**(2)** The tax is levied upon the occupation of freezer ships and floating cold storages, but is based upon the value of the raw fish "bought or otherwise obtained for processing through freezing," and not upon the operation of freezing, as contended by defendants. Hence the prosecution of the line of business of the defendants taxed is not the freezing, the major portion of which is done outside the three-mile limit, but the taking of the fish, all of which is done within the Territoral limits. The rule of Cunard Steamship Co. v. Mellon, 262 U.S. 100, 43 S.Ct. 504, 67 L.Ed. 894, limiting the jurisdiction of the Territory over Territorial waters within the three-mile zone, does not apply in this case. Martinsen v. Mullaney, D.C., 85 F.Supp. 76, at pages 78, 79.

**(3)** It is well settled that the imposition by the Legislature of the Territory of license taxes relating to the commercial fisheries of Alaska to provide revenue as authorized by the Organic Act does not in any way alter, amend, modify, or repeal the existing fish laws of the United States applicable to Alaska; and hence such are not violative of the White Act or the Organic Act of Alaska. Pacific American Fisheries v. Territory of Alaska, 9 Cir., 2 F.2d 9, affirmed 269 U.S. 269, 46 S.Ct. 110, 70 L. Ed. 270; Alaska Fish Salting, etc., Co. v. Smith, 255 U.S. 44, 41 S.Ct. 219, 65 L. Ed. 489; Haavik v. Alaska Packers' Ass'n, 263 U.S. 510, 44 S.Ct. 177, 68 L. Ed. 414; Alaska Pacific Fisheries v. Territory, 9 Cir., 236 F. 52.

The case of Freeman v. Smith, 9 Cir., 44 F.2d 703, wherein it is held that a license tax of $250 on non-resident and $1 on resident fishermen violates the White Act as impairing equal rights of residents and non-residents to fish in Territorial waters, is distinguished from the case at bar as no distinction is made in Chapter 97 between residents and non-residents. In P. E. Harris & Co. v. Mullaney, D.C., 87 F.Supp. 248, 251, a statute imposing a tax on salmon traps in effect 3,000 times greater than the tax on seines was held "so excessive as to infringe on the right to fish on the basis of equality guaranteed by the White Act", and in reality an attempt to accomplish by such legislation the abolishment of fish traps, which was a right reserved to Congress, as "a legislative body may not, under the guise of exerting the power to tax, accomplish a forbidden end." Such attempted regulation does not appear to be the purpose of this Act.

In Anderson v. Smith, 9 Cir., 71 F.2d 493, 495, wherein a license fee of $25 for non-residents and $1 from residents was held not violative of such Act, the Circuit Court of Appeals for this Circuit has this to say upon the question:

"The question involved here, then, is not the power of the Legislature to discriminate between residents and nonresidents, but the question is whether or not the license fee imposed by the territorial Legislature is an unreasonable interference with a right granted by Congress, and, therefore, impliedly prohibited by Congress. * * * We cannot say that the license fee imposed by territorial Legislature in 1933 and now under attack is so unreasonable as to conflict with the act of Congress granting the right to fish (48 U.S. C.A. 222)."

This is the exact situation here. The question of the reasonableness of the license tax is hereinafter discussed.

**(4)** It is equally well settled that a license tax of the nature prescribed by Chapter 97 is not a burden upon or attempted regulation of interstate commerce, because the taxable event— the taking of fish—occurs before the fish have entered the flow of commerce. Most decisive on this point are the decisions of the Supreme Court in the cases of Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 1161, 92 L.Ed. 1460, and Oliver Iron Mining Co. v. Lord, 262 U.S. 172, 43 S.Ct. 526, 67 L.Ed. 929. In the Toomer v. Witsell case a statute imposing a tax of one-eighth cent per pound on green shrimp taken within the three-mile belt

of the coast of South Carolina was held not to violate the commerce clause. The opinion states:

> "Nor does the statute violate the commerce clause. It does not discriminate against interstate commerce in shrimp, and the taxable event, the taking of shrimp, occurs before the shrimp can be said to have entered the flow of interstate commerce."

Defendants rely upon another feature of this decision in which the court holds that a section of the statute which requires that owners of shrimp boats fishing in the maritime belt of South Carolina dock at a South Carolina port and unload, pack and stamp their catch before "shipping or transporting to another state" burdens interstate commerce in violation of the commerce clause; but this decision is wholly distinguishable from the license Act in question. In the Oliver Iron Mining Co. case it is held that an occupation tax on mining ore is not violative of the commerce clause where the ore does not enter interstate commerce until after the mining is done; and hence no discrimination against interstate commerce is involved even though the tax may indirectly affect such commerce. Defendants contend that these decisions do not apply because the "taxable event" is not the taking of the fish but the freezing of the fish. With this I cannot agree, for although it is conceded that the license is upon the "line of business" of freezer ships and floating cold storages, as noted above it is the taking of fish which is the taxable event.

Defendants also rely upon the case of Anderson v. Mullaney, 9 Cir., 191 F.2d 123, affirmed 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458, in which the Ninth Circuit Court of Appeals held invalid under the commerce clause an Alaska statute imposing a license fee of $50 upon non-resident and $5 upon resident fishermen, reversing this court, Folta, J., D.C., 91 F. Supp. 907. But in this case the grounds of the decision were that the legislation imposed discriminatory taxes which operated to affect adversely the movement of interstate commerce by imposing unreasonable restrictions on the movement of fishermen from the states, which the Court described as a "great inter-state movement," beginning with the start of the fishermen north and terminating with the delivery of the finished product to the states; and that therefore the doctrine of Toomer v. Witsell did not apply. This decision is not applicable here, as again there is no discrimination in the Act between residents and non-residents; and the Act cannot be said to impose such unreasonable restrictions on the movement of the freezer ships, even though all of the defendants' vessels are registered in and proceed from the states to the fishing grounds.

Defendants also rely upon the case of Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147, also involving the "Louisiana Shrimp Act," in which it is held that prohibiting the export from the state of shrimp with heads and hulls removed was violative of the commerce clause as withholding raw shrimp from shipment out of the state. This was not a revenue or tax measure and is clearly distinguishable. In the same manner Hood & Sons v. Du Mond, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865, relates to the direct curtailment of interstate commerce by regulation.

I am unable to find that Chapter 97 imposes any burden on interstate commerce, or any "artificial rigidity on the salmon industry," by requiring the catching of salmon in the Territory and imposing restrictions on the shipment of fish out of the Territory prior to canning, as contended by defendants.

■ (5) We come now to what this Court regards as the fundamental issue in this case, and that is the validity of the legislative classification in imposing a tax of 1% on the value of fish taken on the line of business of shore-based cold storages, while imposing a 4% tax on the line of business of freezer ships and other floating cold storages. The principle involved was correctly stated in

the opinion of this Court (Folta, J.) in the case of Martinsen v. Mullaney, supra, 85 F.Supp. at page 79, as follows:

"Although the equal protection clause does not prohibit the classification of persons for taxation, such classification must not be unreasonable or arbitrary and, moreover, must be based on differences having a fair and substantial relation to the object of the legislation (which in this case is purely to raise revenue), so that all persons similarly circumstanced shall be treated alike."

New York Rapid Transit Corp. v. City of New York, 303 U.S. 573, at page 584, 58 S.Ct. 721, 82 L.Ed. 1024; Oliver Iron Mining Co. v. Lord, supra; Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245; State Board of Tax Com'rs of Indiana v. Jackson, 283 U.S. 527, 51 S.Ct. 540, 75 L.Ed. 1248.

■■ Differences in tax burdens not shown to be substantial, or which are based on discrimination not shown to be arbitrary or capricious, do not fall within the Constitutional prohibitions; and such statutes must be sustained if founded upon "substantial differences" between the occupations classified; or, the fact of discrimination in favor of a certain class does not make it arbitrary if the discrimination is founded on a reasonable distinction. Lawrence v. State Tax Commission, 286 U.S. 276, 52 S.Ct. 556, 76 L.Ed. 1102; State Board of Tax Com'rs of Indiana v. Jackson, supra. In fact a very wide discretion must be conceded to the legislative power of the state in the classification of trades, callings, businesses, or occupations which may be subject to special forms of taxation as through a license tax; and if the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of equal protection of the law. State Board of Tax Com'rs of Indiana v. Jackson, supra, 283 U.S. at page 537, 51 S.Ct. 540; Madden v. Commonwealth of Kentucky, 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590; Metropolitan Casualty Ins. Co. of New York v. Brownell, 294 U.S. 580, 55 S.Ct. 538, 79 L.Ed. 1070. The burden of proof is on the party asserting the invalidity of such tax. Mullaney v. Anderson, 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458.

In the following decisions statutes relating to the commercial fisheries of Alaska have been held valid as not contravening the Constitutional prohibitions of the equal protection or privileges and immunities clauses of the Constitution: Alaska Fish Salting, etc., Co. v. Smith, supra (upholding license tax on manufacturers of fish oil and fertilizers from herring, although imposing higher taxes than those imposed on manufacturers of fish oil or fertilizer from other fish or offal of salmon); Pacific American Fisheries v. Territory of Alaska, supra [2 F.2d 12] (holding license tax on salmon canneries graduated upward according to number of cases valid as not "so unreasonable and discriminatory" as to render it void, though admittedly discriminating between large and small canneries); Alaska Pacific Fisheries v. Territory of Alaska, supra (holding occupational license tax on fish traps valid where the basis of classification of businesses is "reasonable and not merely arbitrary"); Haavik v. Alaska Packers' Ass'n, supra (upholding annual license tax of $50 on non-resident fishermen as not contravening the privileges and immunities clause). See, also, Peringer v. Territory of Alaska, 9 Cir., 218 F.2d 490 (upholding the Territorial income tax where there is an "obvious distinction between classes"); and Yerian v. Territory of Hawaii, 9 Cir., 130 F.2d 786 (holding discrimination in classification between civilian employees and personnel of Armed Forces under a welfare act was not so arbitrary or unreasonable as to violate the Constitution).

Defendants rely upon the decisions of Mullaney v. Anderson, Toomer v. Witsell, and Martinsen v. Mullaney, supra. In the Anderson case the Supreme Court affirmed a decision of the Ninth Circuit Court making an unwarranted distinc-

tion between resident and non-resident fishermen as also violative of the privileges and immunities clause. In the same manner the Supreme Court in the Toomer v. Witsell case held another statute of South Carolina requiring residents to pay a license fee of $25 for shrimp boats and $2,500 for non-residents violative of the privileges and immunities clause. Martinsen v. Mullaney likewise held invalid a discrimination between resident and non-resident fishermen as violative of the equal protection clause. None of these decisions are persuasive in this case. In fact the Court found in the Martinsen case that the stipulation on which the case was submitted "contains no facts tending to justify the discrimination * * * on any ground."

Tested by these principles it is necessary to examine the evidence to determine what, if any, reasonable distinctions exist as a matter of fact to justify the differential between the two classes. Defendants contend that there is none and that the two operations are identical, except that the freezer ships freeze their fish by the "brine method" and the land-based cold storages by the "sharp freeze method" with the same result (testimony of Homer Kyros). If this were the only difference such would manifestly not justify the tax classification. However, other more important distinctions are pointed out by plaintiff, of which the following are particularly worthy of note:

(1) One class is a land-based operation and the other is a transient operation continually on the move (deposition of Thomas Parke). This situation has been recognized as an "evident difference, in the mode of doing business." Singer Sewing Mach. Co. v. Brickell, 233 U.S. 304, 34 S.Ct. 493, 497, 58 L.Ed. 974.

(2) One class consists of local businessmen who pay local and Territorial taxes and who supply employment in the community, while the other class pays no such taxes and contributes little, if anything, to the development of the community and the Territory (deposition of Thomas Parke). It has been held that the encouragement of local enterprise or the taxation of one class of business leaving another untaxed to promote public interest may be considered a proper subject of classification even though favoring local residents. Haavik v. Alaska Packers' Ass'n, supra; Carmichael v. Southern Coal & Coke Co., supra. With regard to the payment of taxes, the land-based cold storages pay, in addition to the 1% tax, employment security taxes, school tax and income tax to the Territory; and where situate within an incorporated city pay property taxes to such municipality (deposition of Wallace George). This item appears of particular importance in relation to the object and purpose of the Act, that is revenue.

It is argued by defendants that in any event this would not justify a difference of four times the tax on land-based cold storages, as it was shown that on the basis of 1,000 fish the canneries would pay double the amount of the 4% tax under Chapter 97 (deposition of Thomas Parke; plaintiff's answer to interrogatory No. 10). It may be that this factor alone would not justify the differential established; but certainly it may be taken into consideration along with other factors as considered herein.

(3) Neither class is in any way in competition with the other, and each has a different objective, for the freezer ships and the floating cold storages freeze fish for later canning only, while most of the fish taken by the land-based cold storages are frozen for the fresh fish market; in fact the freezer ships take seine-caught salmon while the land-based cold storages for the most part take the more valuable and higher priced troll-caught king and cohoe salmon (testimony of Jack C. Pinkerton; depositions of Wallace George and Thomas Parke). This is indeed a basic difference in operation, which the Legislature without doubt had in mind, and which alone may justify the discretion of the Legislature in making such classification.

(4) The cost of administering the tax laws and collecting taxes against freezer ships and floating cold storages is appreciably higher than the cost of administration and collection against land-based operators (deposition of Thomas Parke; exhibits 12 & 13). This item may also be taken into consideration as a basis for classification, as long as there is a reasonable relationship between the higher tax and higher cost to the Territory. Toomer v. Witsell, supra; Madden v. Commonwealth of Kentucky, supra; Mullaney v. Anderson, supra: Fernandes v. Wiener, 326 U.S. 340, at page 360, 66 S.Ct. 178, 90 L.Ed. 116. Defendants contend that such fact was not within the knowledge of the Legislature at the time of increasing the tax from 1% to 4% in 1951; and it is true that consideration of enforcement costs should be based on known facts existing at the time "within the knowledge and experience of the legislature." Metropolitan Casualty Ins. Co. of New York v. Brownell, supra. The evidence did not indicate any substantial difference in the ratio of administrative costs prior to 1951 (exhibits 12, 13), but as argued by plaintiff the Legislature may well have anticipated such increased costs, especially on raising the rate of tax.

(5) The freezer ships do not pay their fair burden of conservation costs of the Alaska Department of Fisheries, involving considerable appropriations of the Legislature (exhibit No. 15). It is likewise held that the Legislature may impose a differential for any conservation expenditures from taxes which only residents pay. Toomer v. Witsell, supra; Carmichael v. Southern Coal & Coke Co., supra; Madden v. Commonwealth of Kentucky, supra.

Other differences are pointed out by plaintiff but such do not appear to be of sufficient importance to be reviewed here.

Defendants also complain that salmon canneries, both shore-based and floating, are taxed at 1% of the value of fish frozen and not later canned, Section 1(a) (1), Chapter 82, S.L.A. 1949, and are not taxed at all with respect to the preservation through freezing of fish later canned; also that vessels engaged in the transportation of fish preserved through icing, as halibut boats, are not taxed during the years involved in this action. However, the evidence disclosed that the amount of fish taken by land-based cold storages which are not frozen for the market but frozen for later delivery to canneries is very small; and that this seldom occurs, and only when the run on canneries is so heavy that they cannot immediately take care of the fish delivered to them (deposition of Wallace George). Moreover, such canneries are subject to a 6% tax on the value of all raw fish purchased or otherwise obtained for canning. Chapter 82, S.L.A. 1949, as amended by Chapter 113, S.L.A. 1951. I do not find that this discrimination is sufficient to justify the invalidity of the tax.

Defendants further contend that the decisions upholding the classifications above referred to relate to the police power of the state which is prohibited in this instance as the Territory may not regulate the fisheries, but I do not find this contention to be sustained; nor does it come within the rule of Great Atlantic & Pacific Tea Co. v. Grosjean, 301 U.S. 412, 57 S.Ct. 772, 81 L.Ed. 1193. See especially where this subject is mentioned, State Board of Tax Com'rs of Indiana v. Jackson, supra, and Pacific American Fisheries v. Territory of Alaska, supra.

In view of the distinctions above pointed out I cannot hold the classification made by the statute to be arbitrary and unreasonable, but find that there do exist substantial differences between these two businesses which constitute a sufficient basis for the classification made.

6th Defense. Finally, defendants complain that the imposition of the tax is so arbitrary and oppressive as to be confiscatory, denying their right to preserve fish in violation of the due process clause. There was no sufficient show-

ing to justify any such finding. Alaska Fish Salting, etc., Co. v. Smith, supra; Haavik v. Alaska Packers' Ass'n, supra.

By reason of the above, I cannot hold the statute repugnant to any of the clauses of the Constitution upon which defendants rely.

### Counterclaim

In view of the above decisions a counterclaim of four of the defendants for taxes allegedly paid under protest or threat of seizure of vessels need not be considered; except suffice it to say that there was no evidence of any such payment under protest or threatened seizure (deposition of Thomas Parke).

### Lien

A separate issue has been raised in the Northern Reefer Co. and Grimes Packing Co. case as to a lien claimed on the vessel Reefer II under Section 4 (h), Chapter 82, S.L.A. 1949, as a result of unpaid tax liability incurred by the prior owners of the vessel while employed in Alaskan waters. During the tax year 1952 this vessel was owned by O. L. Grimes, d.b.a. Grimes Packing Co., and was admittedly used for the purpose covered by the Act during such season, by reason of which the Grimes Packing Co. or O. L. Grimes incurred a tax liability under the Act amounting to $3,925.73, which is unpaid. In December, 1952, O. L. Grimes died. Some time after February 1, 1953, the vessel was transferred by administrator's sale from the estate of O. L. Grimes to the Northern Reefer Co., a purchaser for value in good faith and without notice of any liens. The Territory had no actual notice of the death of Grimes, the probate of his estate or the transfer of the vessel, until after the commencement of this action.

The lien provision of the statute is as follows:

"(h) Liens. All taxes levied or provided or accruing under the provisions of this Act, and the penalties and interest thereon, are hereby declared to be a lien prior, paramount and superior to all other liens, mortgages, hypothecations, conveyances and assignments, upon all the real and personal property of the person, firm or corporation liable therefor, and also upon all the real and personal property used with the permission of the owner thereof in prosecuting the business * * *."
This statute relates to the license tax imposed on salmon canneries. Section 4 of Chapter 97, S.L.A. 1949 further provides as follows:

"The liability to file returns and pay interest and deficiency assessments, and the subjection of property to liens shall be the same as prescribed in the license tax law for salmon canneries."

It will be observed that the return by the taxpayer and payment of the tax was due January 15, 1953, or prior to the conveyance of the vessel, at which time the lien if valid had accrued.

It is understood that the validity of such tax lien was sustained by Judge Folta in the case of Territory of Alaska v. American Can Co., Civil No. 6866–A, upon denying a motion of the defendant to dismiss, but no opinion or memorandum of such decision was filed. It appears generally that such lien provision is a lawful means of insuring collection of taxes, by a defaulting taxpayer from the property used in the prosecution of the line of business; and that although ordinarily there is no liability incurred by the purchaser of personal property to pay a tax assessed against a former owner if no lien for the tax exists against the property purchased at the time of sale, if such tax has become a lien on the personal property of the tax debtor one who purchases the property after the lien attaches takes subject to it, whether he knows of it or not. 84 C.J. S., Taxation, § 644; Annotation, 41 A.L. R. 188, 189.

It is not necessary that notice of lien be recorded, docketed or filed in the absence of statute requiring such. 53 C.J.S., Liens, § 6, p. 850; United

States v. Curry, D.C., 201 F. 371. In this respect the lien is no different than the maritime lien for necessaries furnished vessels under the Ship Mortgage Act of the United States, Title 46 U.S.C.A. § 971.

 This right of lien upon floating equipment such as is involved under the Act in question is in fact of vital importance to the Territory in the matter of enforcement of tax liability, for otherwise operators of vessels liable for the tax may readily escape payment by wholesale leasing arrangements; and must be sustained in the public interest.

Defendants contend that the lien is unenforceable in this instance for the reason that no claim was presented against the administrator of the estate. Although there is some conflict of authority upon this point, the greater number of decisions hold that in the absence of statute requiring presentation of the claim against the estate as a prerequisite to enforcing the lien against specific property, a creditor may rely upon such specific lien although no claim was presented, but in such case has no claim against the general assets of the estate in the hands of the administrator. Annotation, 34 A.L.R. 377, 379; Little v. Keaton, 10 Cir., 38 F.2d 457; In re Baker's Estate, 106 Kan. 326, 187 P. 870. In any event, although there is also some authority to the contrary, it is generally held that a claim for taxes is not even within the contemplation of statutes requiring presentation of claims against decedents' estates. 21 Am.Jur., Executors and Administrators, Sec. 351, p. 580; Annotations, 34 A.L.R. 387; 109 A.L.R. 1370.

Defendants also claim laches in failure of the Territory to promptly enforce its lien, under the rule of The Salvator, D.C., 35 F.Supp. 558; but there was no sufficient showing of want of diligence on the part of the Territory to enforce such lien right; and it is very much to be doubted whether any such defense is available to enforce the rights of the Territorial Government to collect taxes due. 30 C.J.S., Equity, § 114, p. 526.

Judgment may be entered for the amount of the tax shown by stipulation to be due as to each of the defendants, with penalty and interest, together with plaintiff's costs and an attorney's fee on the aggregate amount recovered in accordance with Rule 45, District Court Rules; and holding the lien against the vessel Reefer II to be valid and enforceable.